**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **XAVIER JOHNSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:10CV 2364 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Xavier Johnson for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 16). Defendant has filed a Brief in Support of the Answer. (Doc. No. 21).

## Procedural History

On January 8, 2007, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on December 19, 2005. (Tr. 112-122). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated February 10, 2009. (Tr. 63-65, 6-

17).  On October 27, 2010, the Appeals Council denied plaintiff's request for review.  (Tr. 1-5).

Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§

404.981, 416.1481.

## Evidence Before the ALJ

**A.**   **ALJ Hearing**

Plaintiff's administrative hearing was held on September 10, 2008.  (Tr. 20).  Plaintiff was

present and was represented by counsel.  (Id.).  Vocational expert Dr. White was also present.

(Id.).

Plaintiff's attorney noted that plaintiff had just been released from a five-day hospital stay

the previous week and that he was scheduled to see a liver specialist.  (Tr. 21-22).

The ALJ examined plaintiff, who testified that he was thirty-nine years of age and lived

alone in an apartment.  (Tr. 23).  Plaintiff stated that he was five-feet, eleven-inches tall, and

weighed 176 pounds.  (Tr. 24).  Plaintiff testified that he was single and had no children.  (Id.).

Plaintiff stated that he did not drive, and that he did not have a current driver's license.

(Id.).  Plaintiff testified that he took a taxi to the hearing.  (Id.).

Plaintiff stated that he received housing assistance, food stamps, and Medicaid benefits.

(Tr. 24-25).

Plaintiff testified that he graduated from high school and completed three years of college.

(Tr. 25).  Plaintiff stated that he attended Los Angeles City College for two years, where he

studied police science.  (Id.).  Plaintiff testified that he also took a security course at Ralston

College.  (Tr. 26).  Plaintiff stated that he had been a licensed security officer, although his license

was not current at the time of the hearing.  (Id.).

Plaintiff testified that he was not working at the time of the hearing. (Id.). Plaintiff stated that he last worked full-time on December 19, 2005, on a temporary assignment setting up events for Action Temp Service. (Id.). Plaintiff testified that he worked less than eight hours a day on an as-needed basis at this position. (Tr. 27).

Plaintiff stated that he worked for Gaines and Associates, another temporary service, performing full-time seasonal work in the summer. (Id.).

Plaintiff testified that he alleged December 19, 2005 as an onset of disability date because he passed out at a friend's house on that date. (Id.). Plaintiff stated that he thought he had experienced a seizure, and called his doctor the next day. (Id.). Plaintiff testified that his doctor referred him to a neurologist, who performed testing and determined that there was no seizure activity. (Tr. 28).

Plaintiff stated that his last day of work was July 21, 2006. (Id.). Plaintiff testified that he worked for Gaines and Associates every summer wrapping pallets on the docks. (Id.). Plaintiff stated that he stopped working at this position because he began experiencing more frequent attacks. (Id.).

Plaintiff testified that he has worked as a volunteer for various nonprofit organizations since he stopped working. (Tr. 29). Plaintiff stated that he has worked as a receptionist. (Id.).

Plaintiff testified that he worked for a food pantry on essentially a full-time basis for about three months, at which time he started experiencing frequent attacks. (Id.). Plaintiff stated that he stopped volunteering for this organization on a regular basis in September of 2007. (Id.). Plaintiff testified that he still occasionally assists at the food pantry but does not commit to a schedule due to his health issues. (Id.).

Plaintiff stated that he has applied to a work release program through Effort for AIDS, which helps participants either return to school or find employment. (Tr. 30). Plaintiff testified that he would like to go back to school to further his education. (Id.). Plaintiff stated that he did not believe he would be able to work at any position due to his frequent hospitalizations. (Id.). Plaintiff testified that he has not started school due to his health problems and frequent doctor appointments. (Tr. 31).

Plaintiff stated that he worked as an assembler and packer from 1993 to 1997. (Id.).

Plaintiff testified that he worked as a cashier for Schnucks for about one year in 1995. (Id.). Plaintiff stated that he left this position because he moved back to California for period of time. (Tr. 32).

Plaintiff testified that he worked in customer service in 1999. (Id.).

Plaintiff stated that he worked as a dishwasher for about a year in 1996. (Id.). Plaintiff testified that he left this position because he started experiencing attacks. (Id.).

Plaintiff stated that he worked as a sales associate in the shoe department at JC Penney from 1997 to 1998. (Id.). Plaintiff testified that he left this position due to his health problems. (Tr. 33).

Plaintiff stated that he worked as a security officer for Whalen from 1990 to 1992. (Id.). Plaintiff testified that he worked as a lieutenant at Westport Plaza. (Id.). Plaintiff stated that he was a supervisor at this position. (Tr. 34).

Plaintiff testified that he worked as a co-manager for Little Caesar's in 1996 for one-and-a-half years. (Id.). Plaintiff stated that he managed two different store locations at this position. (Tr. 35). Plaintiff stated that he stopped working at this position because he was burned out due

to working at this position and as a security officer at the same time. (Id.).

Plaintiff testified that he worked as a telemarketer from 2002 to 2003. (Id.). Plaintiff stated that he quit this position because he did not enjoy the work. (Id.).

Plaintiff stated that he worked as a general laborer at Labor Ready Action Temp from 1991 to 2006. (Id.). Plaintiff testified that he was not required to lift anything heavier than fifty pounds at this position pursuant to the employer's contract. (Tr. 36).

Plaintiff stated that he had hoped to use his education to become a juvenile officer but it did not work out. (Id.).

Plaintiff testified that on a typical day, he wakes up at approximately 6:00 a.m. to take his medications and plan his day. (Id.). Plaintiff stated that he cooks mostly microwave meals. (Tr. 37). Plaintiff testified that he does laundry, washes dishes, makes his bed, vacuums, sweeps, mops, and shops for groceries. (Id.).

Plaintiff stated that he requires help from a friend at the grocery store. (Id.). Plaintiff testified that he has become ill and had to leave the store immediately. (Id.). Plaintiff stated that he did not usually have difficulty getting along with people at the grocery store, although he was irritable when he was depressed. (Tr. 38).

Plaintiff testified that he spent the day prior to the hearing meeting with his attorney, meeting with his HIV caseworker, arranging for transportation to his doctor appointments, and keeping track of his medications. (Id.).

Plaintiff stated that he did not really watch television, listen to music, or read. (Id.). Plaintiff testified that he tried to get out and be sociable if he felt well enough. (Id.).

Plaintiff stated that he was very sociable when he was not depressed. (Tr. 39). Plaintiff

testified that he had friends.  (Id.).  Plaintiff stated that he did not have family in the area.  (Id.).  Plaintiff testified that he got along with his neighbors.  (Id.).

Plaintiff stated that he had an agreement with his landlord to keep the common areas clean.  (Id.).  Plaintiff testified that he swept the mulch off the sidewalk and policed the grounds.  (Id.).  Plaintiff stated that it took him all day to sweep because he was so tired.  (Id.).

Plaintiff testified that he spent most of his evenings at home because his night medications made him drowsy.  (Tr. 40).  Plaintiff stated that he had been attending church on Sundays.  (Id.).  Plaintiff testified that he tried to remain very active in the HIV community.  (Id.).  Plaintiff stated that he had represented Food Outreach at a number of events, at which he would answer questions from potential donors.  (Id.).

Plaintiff testified that he had lost interest in most of his hobbies.  (Id.).  Plaintiff stated that he lived near a hospital and was afraid to venture too far away.  (Tr. 41).

Plaintiff testified that he stopped drinking three to four years prior to the hearing due to a hospitalization during which he was told drinking could cause a pancreatitis[1] attack.  (Id.).

Plaintiff stated that he used cocaine on one occasion in 2006.  (Tr. 42).  Plaintiff testified that he had a pancreatitis attack a few days after trying cocaine.  (Id.).  Plaintiff stated that he had not used cocaine since this hospitalization.  (Id.).

Plaintiff testified that he did not use marijuana, although he occasionally tested positive for marijuana due to one of the prescription drugs he was taking.  (Tr. 43).

---

[1]Inflammation of the pancreas.  Stedman's Medical Dictionary, 1410 (28th Ed. 2006).

Plaintiff stated that he had been taking Norvir,[2] Prezista,[3] and a third medication for HIV for about two years. (Id.). Plaintiff testified that he discovered he was HIV-positive and that he had hepatitis B[4] in 1996. (Id.). Plaintiff stated that he had not tested positive for AIDS yet. (Tr. 44). Plaintiff testified that he had recently been tested, which revealed that his viral load[5] was too high and his CD-4[6] was too low. (Id.).

Plaintiff stated that he took three different medications three times a day for nausea. (Id.). Plaintiff testified that he experienced nausea frequently and that many scents and odors triggered the nausea. (Id.). Plaintiff stated that he also has problems with his appetite. (Id.).

Plaintiff testified that he took medication for high blood pressure. (Id.).

Plaintiff stated that he took medication for ulcers in his colon. (Tr. 45). Plaintiff testified that he experienced occasional diarrhea. (Id.). Plaintiff stated that the ulcers caused him to have blood in his stool. (Tr. 46). Plaintiff testified that the ulcers may be caused by his anxiety attacks. (Id.).

_____

[3]Norvir is indicated in combination with other antiretroviral agents for the treatment of HIV-infection. See Physician's Desk Reference (PDR), 491 (63rd Ed. 2009).

[4]A viral disease with a long incubation period caused by a hepatitis B virus, usually transmitted by injection of infected blood or blood derivatives or by use of contaminated needles, lancets, or other instruments, or by sexual transmission. Stedman's at 877.

[5]The plasma level of viral RNA. Serial measurement of HIV viral load is a standard procedure to monitor the course of AIDS. Reported as the number of copies of viral RNA per mL of plasma, assessment of viral load provides important information about the number of lymphoid cells actively infected with HIV. This is an indicator of prognosis for people infected with HIV in determining when to start antiretroviral therapy, and in measuring the response to therapy. Stedman's at 1113.

Plaintiff stated that he had been diagnosed with chronic pancreatitis due to his frequent pancreatitis attacks.  (Id.).  Plaintiff testified that he had also been diagnosed with other things due to these symptoms.  (Id.).  Plaintiff stated that he had been referred to a GI specialist.  (Id.).  Plaintiff testified that his blood work indicated that he was having a pancreatitis attack, yet CT scans and ultrasounds revealed that his pancreas was not swollen.  (Id.).  Plaintiff stated that his GI doctor told him that it was possible to have a pancreatitis attack with no pancreatic swelling.  (Id.).  Plaintiff testified that his doctor believes that his nervous system is attacking his GI system and has referred him to a neurologist.  (Tr. 47).

Plaintiff stated that he experienced problems with anxiety and nerves.  (Id.).  Plaintiff testified that he took Klonopin,[7] which helped with these symptoms.  (Id.).

Plaintiff stated that he also took Lunesta[8] for sleep, and Prozac[9] for depression.  (Id.).  Plaintiff testified that he experienced depression, and that he had been diagnosed with manic depression[10] with psychosis.  (Id.).  Plaintiff stated that his doctor discontinued the Prozac because his liver enzymes were elevated.  (Id.).

Plaintiff testified that he took Hydromorphone.[11]  (Id.).  Plaintiff stated that he experienced

---

[7]Klonopin is indicated for the treatment of panic disorder.  See PDR at 2639.

[8]Lunesta is indicated for the treatment of insomnia.  See PDR at 2995.

[9]Prozac is a psychotropic drug indicated for the treatment of major depressive disorder. See PDR at 1854.

[10]Manic depression, or bipolar disorder, is an affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes.  Stedman's at 568.

[11]Hydromorphone is a narcotic analgesic indicated for the relief of moderate to severe pain.  See WebMD, http://www.webmd.com/drugs (last visited March 5, 2012).

constant abdominal pain. (Tr. 48). Plaintiff testified that he also experienced headaches. (Id.). Plaintiff stated that he was experiencing pain at a level of four on a scale of one to ten at the hearing. (Id.). Plaintiff testified that his pain has exceeded a ten. (Id.).

Plaintiff stated that he took medication to protect the lining in his stomach due to the medications he takes. (Id.).

Plaintiff testified that he took Truvada[12] for hepatitis B. (Tr. 49). Plaintiff stated that he experienced exhaustion due to the hepatitis B. (Id.).

Plaintiff testified that he stopped taking Oxycodone[13] due to severe headaches. (Id.). Plaintiff stated that he took Tramadol[14] as needed. (Id.).

Plaintiff testified that he experienced an upset stomach due to his medications. (Id.). Plaintiff stated that he also experienced a loss of appetite, and low energy. (Tr. 50).

Plaintiff testified that due to the depression, he did not want to be bothered by people, he lost interest in things he used to enjoy, and he wanted to sleep a lot. (Id.).

Plaintiff stated that he had experienced panic attacks due to his anxiety. (Id.). Plaintiff testified that his medications helped control the attacks. (Id.). Plaintiff stated that did not take his anxiety medication the day of the hearing, and that he was not having any problems. (Id.).

Plaintiff testified that he was under the care of a psychiatrist, who he was scheduled to see

_____

[12]Truvada is indicated for the treatment of HIV infection. See WebMD, http://www.webmd.com/drugs (last visited March 5, 2012).

[13]Oxycodone is indicated for the management of moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time. See PDR at 2590.

[14]Tramadol is indicated for the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time. See PDR at 2429.

monthly.  (Id.).  Plaintiff stated that he also saw a therapist at his psychiatrist's office, John Wayne.  (Tr. 51).  Plaintiff testified that he saw Mr. Wayne frequently, and contacted him when he felt like giving up.  (Id.).

Plaintiff stated that he was hospitalized in a mental hospital for almost a month three years prior to the hearing because he was suicidal.  (Id.).  Plaintiff testified that he had made a couple of suicide attempts in the past.  (Id.).  Plaintiff stated that he had taken a bottle of pills.  (Tr. 52). Plaintiff testified that he did not think about suicide at the time of the hearing.  (Id.).

Plaintiff stated that he did not hear voices, although he had problems with paranoia when he was in crowds.  (Id.).

Plaintiff testified that he had problems with his concentration and focus.  (Id.).

Plaintiff stated that he did not experience difficulty sitting in a chair.  (Id.).  Plaintiff testified that the length of time he was able to stand varied depending on whether his liver enzymes were elevated.  (Id.).  Plaintiff stated that, when his liver enzymes were elevated, he was exhausted.  (Id.).  Plaintiff testified that he was exhausted after walking from the lobby to the elevator prior to the hearing.  (Id.).  Plaintiff stated that he was able to lift a bag of groceries containing two gallons of milk at the time of the hearing, although there were times when he was unable to lift anything heavier than ten pounds.  (Id.).  Plaintiff testified that he had problems with postural activities such as stooping, crouching, and bending.  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he had lost thirty pounds in the month prior to the hearing due to being hospitalized.  (Tr. 54).

Plaintiff stated that stress was a factor that triggered his pancreas attacks.  (Tr. 55).

Plaintiff testified that he had been hospitalized four times in the two months prior to the hearing for pancreatic attacks. (Id.). Plaintiff stated that he experienced nausea and vomiting during an attack. (Id.).

Plaintiff testified that he saw a doctor at Community Alternatives for his depression. (Id.). Plaintiff stated that he last saw this doctor a few months prior to the hearing. (Id.). Plaintiff testified that he believed he was unable to work due to the number of medications he took, the number of medical appointments he had, and his unpredictable medical problems. (Tr. 56). Plaintiff stated that he never knew how he would feel from day-to-day. (Id.).

The ALJ then re-examined plaintiff, who testified that he was wearing a brace on his right arm during the hearing because he had tissue damage from frequent IVs. (Id.).

The ALJ then examined the vocational expert, Dr. White. (Tr. 58). The ALJ asked Dr. White to assume a hypothetical claimant with the following limitations: capable of performing the exertional demands of light work; simple, repetitive tasks and instructions; and only occasional interaction with supervisors, co-workers, and the public. (Tr. 59). Dr. White testified that the claimant would be unable to perform plaintiff's past relevant work. (Id.). Dr. White stated that the individual could perform other jobs, such as assembler and electronics worker. (Tr. 59-60).

Plaintiff's attorney then questioned Dr. White, who testified that an electronics worker assembled items. (Tr. 60). Dr. White stated that an individual with additional limitations of problems with memory and concentration would be unable to perform the positions he cited (Id.).

The ALJ indicated that he would leave the record open for thirty days to allow plaintiff to

submit additional medical records.  (Tr. 61).

**B.     Relevant Medical Records**

The record reveals that plaintiff presented to the emergency room at St. Louis University Hospital on December 3, 2003, with complaints of numbness in legs for two months, and low back pain following a motor vehicle accident.  (Tr. 209).  It was noted that plaintiff had a history of HIV and hepatitis B.  (Id.).  Plaintiff was diagnosed with muscular strain secondary to motor vehicle accident and paresthesia[15] of unknown etiology.  (Tr. 212).

Plaintiff presented to St. Louis University Hospital on March 30, 2004, with complaints of depression and suicidal thoughts.  (Tr. 487-99).  Plaintiff was diagnosed with major depression[16] and alcohol abuse.  (Tr. 488).

Plaintiff was hospitalized from April 13, 2004 to May 7, 20004, for suicidal ideation.  (Tr. 468-71).  Plaintiff reported a history of three suicide attempts by overdose.  (Tr. 468).  It was noted that plaintiff was treated for depression with Prozac and Trazodone[17] two years prior without help. (Id.).  Plaintiff was diagnosed with major depressive disorder with psychosis with a GAF score[18] of

---

[15]A spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking); may be due to lesions of both the central and peripheral nervous systems.  Stedman's at 1425.

[16]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness.  Stedman's at 515.

[17]Trazodone is an antidepressant indicated for the treatment of depression.  See WebMD, http://www.webmd.com/drugs (last visited March 5, 2012).

[18]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

60[19] upon discharge.  (Tr. 470).  Plaintiff was prescribed Symbyax.[20]  (Id.).

Plaintiff saw T. Gonzalez, Ph.D., at BJC Behavioral Health for a psychological evaluation on June 3, 2004.  (Tr. 310-19).  Plaintiff reported three prior suicide attempts.  (Tr. 310).  Plaintiff reported depression, restlessness, irritability, and a sense of being overwhelmed.  (Id.).  Dr. Gonzalez diagnosed plaintiff with recurrent major depression with psychotic features, alcohol dependence, and assessed a GAF score of 65.  (Tr. 318).

Plaintiff saw psychiatrist Monica Bishop, M.D. at BJC Behavioral Health on June 7, 2004, at which time he described his mood as "sad, lonely, and down."  (Tr. 322).  Plaintiff denied any suicidal ideation.  (Id.).  Dr. Bishop diagnosed plaintiff with major depressive disorder with psychotic features, rule out bipolar affective disorder, and a GAF score of 60.  (Tr. 320).  Dr. Bishop noted that plaintiff still complained of some depressive symptoms, but overall seemed to be doing better.  (Tr. 323).  Dr. Bishop prescribed Symbyax and Trazodone.  (Tr. 324).  Plaintiff attended follow-up appointments at BJC Behavioral Health on June 19, 2004, November 16, 2004, and June 13, 2005.  (Tr. 320-29).

Plaintiff was hospitalized for chest pain and gastrointestinal bleeding from September 18, 2004, through September 23, 2004.  (Tr. 277).  It was noted that plaintiff had a history of gastrointestinal bleeding with dark red blood per rectum.  (Id.).  At the time of discharge, plaintiff's pain and bleeding had resolved.  (Id.).

Plaintiff presented to the emergency room with complaints of continuous chest pain on

---

[19]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

[20]Symbyax is an antidepressant indicated for the treatment of depressive episodes associated with bipolar disorder.  See PDR at 1873.

October 9, 2004.  (Tr. 266).  Plaintiff was prescribed Zantac.[21]  (Tr. 267).  Plaintiff returned to the

emergency room on October 10, 2004, with complaints of chest congestion, vomiting, and bloody

stools.  (Tr. 271).  Plaintiff was diagnosed with upper GI bleeding, and was prescribed Protonix.[22]

(Tr. 272).

Plaintiff presented to the emergency room again on November 23, 2004, with complaints of

chest pressure.  (Tr. 257).  Plaintiff was diagnosed with anemia[23] and gastroenteritis[24]/gastritis.[25]  (Tr.

258).

Plaintiff underwent surgery for left inguinal hernia[26] repair on December 6, 2004.  (Tr. 356-

57).

Plaintiff was hospitalized from December 26, 2004, through December 30, 2004, with

complaints of nausea, vomiting, and epigastric pain.  (Tr. 293).  Upon discharge, it was noted that

plaintiff's symptoms were probably due to a combination of hiatal hernia[27] and mild pancreatitis,

---

[21]Zantac is indicated for the treatment of GERD.  See PDR at 1672.

[22]Protonix is indicated for the treatment of GERD.  See PDR at 3255.

[23]A condition in which the number of red blood cells, the amount of hemoglobin of blood, and/or the volume of packed red blood cells of blood are less than normal.  Anemia is frequently manifested by pallor of the skin and mucous membranes, shortness of breath, palpitations of the heart, lethargy, and tendency to fatigue.  Stedman's at 78.

[24]Inflammation of the mucous membrane of both stomach and intestine.  Stedman's at 791.

[25]Inflammation, especially mucosal, of the stomach.  Stedman's at 790.

[26]Protrusion of intestinal soft tissue through a tear in the lower abdominal wall.  See Stedman's at 879-880.

[27]Protrusion of part of the stomach through the esophageal hiatus of the diaphragm.  See Stedman's at 880.

although peptic ulcer disease[28] could not be excluded. (Id.).

On October 5, 2005, plaintiff underwent surgical excision of hemorrhoids. (Tr. 353).

On October 24, 2005, plaintiff presented to the emergency room with complaints of severe abdominal pain, bloody stools, nausea, and vomiting. (Tr. 332). Plaintiff was diagnosed with gastritis. (Tr. 344).

Plaintiff was hospitalized at St. Luke's Hospital from December 29, 2005, through December 31, 2005, due to a syncopal[29] episode. (Tr. 626). Plaintiff's admitting diagnoses were intervascular volume depletion and loss of consciousness. (Tr. 634). Plaintiff was also diagnosed with iron-deficiency anemia. (Tr. 626).

Plaintiff received follow-up treatment for episodes of syncope at St. Louis Connect Care on January 4, 2006, January 9, 2006, and January 25, 2006. (Tr. 441-42, 437, 434).

Plaintiff underwent an MRI of the brain on January 16, 2006, which was normal. (Tr. 363).

Plaintiff presented to St. Louis Connect Care on February 15, 2006, at which time he reported an episode of "passing out" while talking to friends. (Tr. 427). Plaintiff was diagnosed with syncope with no obvious cause. (Tr. 428). Plaintiff was also diagnosed with colitis[30]/proctitis[31] and GERD.[32]

_____

[28]Ulcers of the lining of the stomach or first part of the small intestine. See Stedman's at 2062.

[29]Loss of consciousness and postural tone caused by diminished cerebral blood flow. Stedman's at 1887.

[30]Inflammation of the colon. Stedman's at 408.

[31]Inflammation of the mucous membrane of the rectum. Stedman's at 1569.

[32]Gastroesophageal reflux disease, or "GERD," is a syndrome due to structural or functional incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric juice into the esophagus. Stedman's at 556.

(Id.).

Plaintiff was hospitalized from March 19, 2006, through March 21, 2006, due to complaints of nausea, vomiting, and abdominal pain, possibly due to gastritis. (Tr. 382). Plaintiff underwent a CT scan of the abdomen and pelvis, which revealed gallstones and no signs of pancreatitis. (Id.). Upon discharge, it was noted that the etiology of plaintiff's symptoms was unknown, although they may be secondary to gallbladder disease, secondary to drug reaction with multiple HIV medications, or secondary to an HIV-related dysautonomia.[33] (Tr. 382-83). Plaintiff was also diagnosed with manic depression during his admission. (Tr. 388).

Plaintiff followed-up at St. Louis Connect Care on March 29, 2006, April 5, 2006, and April 10, 2006. (Tr. 424, 421, 419).

Plaintiff was hospitalized at St. Alexius Hospital from April 22, 2006, through April 29, 2006, with complaints of worsening abdominal pain. (Tr. 236). Plaintiff was diagnosed with cholecystitis[34] and underwent a laparoscopic cholecystectomy[35] on April 27, 2006. (Tr. 238). Plaintiff followed-up with St. Louis Connect Care on May 17, 2006. (Tr. 417).

Plaintiff presented to the emergency room on May 21, 2006, with complaints of blood in his stool and nausea. (Tr. 226). It was noted that pancreatitis could be the cause. (Id.).

Plaintiff followed-up at St. Louis Connect Care on June 29, 2006, at which time he complained of dizziness, headache, and nausea. (Tr. 413-14). Plaintiff's HIV was noted to be well-controlled. (Tr. 415). Plaintiff's medications were adjusted. (Id.).

---

[33]Abnormal functioning of the autonomic nervous system. Stedman's at 595.

[34]Inflammation of the gallbladder. Stedman's at 365.

[35]Surgical removal of the gallbladder. Stedman's at 365.

On September 13, 2006, plaintiff presented to St. Louis Connect Care with complaints of depression. (Tr. 410). Plaintiff's medications were adjusted. (Id.).

Plaintiff was hospitalized from October 11, 2006, through October 18, 2006, at Metropolitan Psychiatric Center due to depression. (Tr. 459-60). Plaintiff reported increasing depression over the past month with passive suicidal ideation. (Tr. 459). It was noted that plaintiff's Zyprexa,[36] Prozac, and Trazodone were stopped secondary to medical complications. (Id.). Plaintiff was diagnosed with recurrent major depressive disorder with psychotic features; alcohol and cocaine abuse; and marijuana abuse; with a GAF score of 40-50.[37] (Tr. 460).

On October 23, 2006, plaintiff presented to the emergency room with complaints of abdominal pain, nausea, and vomiting. (Tr. 537). Plaintiff underwent a CT scan of the abdomen, which revealed a small hiatal hernia and hepatomegaly.[38] (Tr. 578).

On October 29, 2006, plaintiff presented to the emergency room with complaints of chest pain, nausea, and vomiting. (Tr. 583). Plaintiff was diagnosed with gastritis and GERD. (Tr. 584).

On December 4, 2006, plaintiff followed-up at St. Louis Connect Care, at which time he complained of stomach pain, back pain, nausea, decreased appetite, and heat intolerance. (Tr. 406-07). Mild tenderness was noted in the left side of plaintiff's abdomen. (Tr. 407). Plaintiff was

---

[36]Zyprexa is indicated for the treatment of schizophrenia and bipolar disorder. See PDR at 1884-1885.

[37]A GAF score of 31-40 denotes some impairment in reality testing or communication (e.g., speech is at time illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work). DSM-IV at 32. A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id.

[38]Enlargement of the liver. Stedman's at 878.

referred to a GI specialist.  (Id.).

Plaintiff saw a gastroenterologist at St. Louis Connect Care on January 5, 2007, at which time additional testing was ordered.  (Tr. 399).

On January 17, 2007, plaintiff underwent x-rays of the upper gastrointestinal tract and small bowel, which were normal.  (Tr. 598).

James Lane, Ph.D., a non-examining state agency psychologist, completed a Psychiatric Review Technique on February 27, 2007.  (Tr. 602-613).  Dr. Lane expressed the opinion that plaintiff's major depressive disorder with psychotic features and polysubstance abuse resulted in mild limitations in plaintiff's activities of daily living and ability to maintain social functioning; and moderate limitations in plaintiff's ability to maintain concentration, persistence, or pace.  (Id.).  Dr. Lane also completed a  Mental Residual Functional Capacity Assessment, in which he expressed the opinion that plaintiff had moderate limitations in his ability to understand and remember detailed instructions; carry out detailed instructions; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and interact appropriately with the general public.  (Tr. 599-601).  Dr. Lane stated that plaintiff retains the functional capacity to interact adequately with peers and supervisors; understand, follow, and complete at least simple instructions; maintain adequate concentration, persistence and pace with at least simple work duties; and adapt adequately to routine work changes.  (Tr. 601).

Plaintiff presented to the emergency room on April 19, 2007, with complaints of lower right-side abdominal pain.  (Tr. 614, 616).  Plaintiff was diagnosed with an inguinal hernia.  (Tr. 616).

In a treatment note from Dr. Matthew German dated May 16, 2007, it was noted that plaintiff

had not taken his medications in eight days.  (Tr. 649).

Plaintiff was hospitalized from July 11, 2007, through July 14, 2007, for lower left quadrant pain and bloody stools.  (Tr. 745-49).  Plaintiff underwent a CT scan of the abdomen and pelvis, which revealed colitis, gastritis, a small periumbilical hernia, and hepatomegaly.  (Tr. 750).

Plaintiff saw gastroenterologist Louay M. Orman, M.D., on July 17, 2007, at which time plaintiff continued to report bright red blood per rectum in small amounts and crampy lower abdominal pain.  (Tr. 663).  Upon physical examination, Dr. Orman noted mild tenderness in both lower quadrants, but plaintiff's examination was unremarkable otherwise from a GI standpoint.  (Id.). Dr. Orman indicated that a colonoscopy confirmed proctitis.  (Id.).  Dr. Orman prescribed medication to treat the proctitis.  (Id.).

Plaintiff presented to the emergency room on July 31, 2007, with complaints of abdominal pain, back pain, and bloody stools.  (Tr. 734, 737).  Plaintiff was diagnosed with gastritis.  (Tr. 738).

Plaintiff presented to Community Alternatives on August 7, 2007, with complaints of increased paranoia.  (Tr. 669-75).  Plaintiff was diagnosed with bipolar disorder, and was given a GAF score of 50.  (Tr. 670).  Plaintiff saw a psychiatrist at Community Alternatives on August 13, 2007, at which time he complained of worsening depression and paranoia.  (Tr. 680).  Upon examination, plaintiff's mood was depressed and his affect blunted.  (Tr. 681).  Plaintiff was diagnosed with major depressive disorder; rule out bipolar affective disorder; alcohol dependence; and rule out anxiety disorder; with a GAF score of 60.  (Id.).  Plaintiff was started on Prozac.  (Id.).  It was noted that plaintiff had not taken medication in six months.  (Tr. 682).

Plaintiff continued to receive psychiatric treatment at Community Alternatives from September 2007 through February 2008.  (Tr. 685-710).  Plaintiff was diagnosed with major depressive disorder,

and generalized anxiety disorder[39] with panic attacks on September 10, 2007. (Tr. 685). Plaintiff was prescribed Prozac and Klonopin. (Id.). On October 31, 2007, plaintiff was brought in by his sister and reported experiencing panic attacks and feeling suicidal. (Tr. 686). Plaintiff left with his sister, who indicated that she would help him through his crisis. (Id.). Plaintiff subsequently missed many scheduled appointments. (Tr. 689-709). On November 16, 2007, plaintiff met with a social worker, at which time he complained of low mood, and severe depressive symptoms. (Tr. 693). On January 30, 2008, plaintiff reported feeling depressed, with poor sleep, poor energy, and poor concentration. (Tr. 707). Plaintiff reported experiencing two to three panic attacks a week. (Id.). Plaintiff's affect was blunted. (Id.). The dosages of plaintiff's medications were increased. (Tr. 708).

Plaintiff saw Dr. Omran on October 16, 2007, with complaints of continued episodes of nausea, vomiting, abdominal pain, and rectal bleeding. (Tr. 661). Plaintiff reported that the episodes were debilitating and caused him not to eat for three to four days and not to take his medications. (Id.). Dr. Omran diagnosed plaintiff with colitis and acute proctitis. (Tr. 662).

Plaintiff was hospitalized overnight on October 31, 2007, for intractable nausea and vomiting. (Tr. 770). It was also noted that plaintiff's depression had been aggravated, and that he had been experiencing frequent anxiety attacks. (Tr. 773). Plaintiff indicated that his anxiety medications were not helping, and that he had been having frequent crying spells and occasional suicidal thoughts. (Id.). Plaintiff underwent CT scans, which did not reveal any significant findings. (Tr. 771). Upon discharge, plaintiff was diagnosed with subacute to chronic nausea and vomiting of unknown origin, and depression. (Tr. 771).

---

[39]A psychological disorder in which anxiety or morbid fear and dread accompanied by autonomic changes are prominent features. Stedman's at 569.

Plaintiff saw Dr. Omran on December 18, 2007, at which time he continued to report debilitating nausea, vomiting, and abdominal pain, occurring most days of the month. (Tr. 657). Plaintiff indicated that the nausea seemed to occur particularly after meals, although it may occur without meals and often leads to vomiting that continues for several times throughout the day. (Id.). Dr. Omran noted that plaintiff's physical examination was unremarkable from a gastrointestinal standpoint. (Id.). Dr. Omran recommended additional testing to determine the cause of plaintiff's symptoms. (Id.).

Plaintiff presented to the emergency room on December 27, 2007, with complaints of ear pain and a possible hernia. (Tr. 739). Plaintiff also reported vertigo. (Tr. 742). Plaintiff was prescribed Phenergan[40] and Percocet.[41] (Id.).

Plaintiff saw Dr. Omran on January 22, 2008, at which time plaintiff reported that his nausea had improved significantly since he started taking Phenergan and Marinol.[42] (Tr. 653). Plaintiff was not symptom-free but was remarkably better. (Id.). Dr. Omran indicated that biopsies revealed the presence of mild chronic gastritis, and a colonoscopy revealed a large rectal ulcer covering about thirty percent of the real circumference. (Id.). Dr. Omran continued plaintiff's medications for his nausea and "mild chronic gastritis," prescribed medication for his rectal ulcer, and rescheduled testing of the small bowel to further investigate his abdominal pain. (Id.). Dr. Omran indicated that he suspected plaintiff's abdominal pain was related to the mesh area post hernia repair. (Id.).

---

[40]Phenergan is indicated for the prevention and treatment of nausea and vomiting. See WebMD, http://www.webmd.com/drugs (last visited March 5, 2012).

[41]Percocet is indicated for the relief of moderate to moderately severe pain. See PDR at 1127.

[42]Marinol is indicated for the treatment of nausea and vomiting. See PDR at 3164.

Plaintiff was hospitalized from February 2, 2008, through February 7, 2008, due to "mental status changes." (Tr. 714). Plaintiff reported confusion, poor short-term memory, poor balance, dizziness, and falls. (Tr. 714). Plaintiff also complained of headaches, abdominal pain, vomiting, and occasional rectal bleeding. (Id.). Plaintiff's symptoms resolved with minimal intervention during the first two to three days of his hospitalization. (Tr. 715). It was noted that plaintiff tested positive for cannabinoids, cocaine, and opioids, and that his confusion may be due in part to polysubstance abuse. (Id.). Upon discharge, plaintiff was diagnosed with acute hepatitis B reactivation and delirium secondary to polysubstance abuse. (Tr. 716). It was recommended that plaintiff avoid excessive use of psychoactive medications and other recreational drugs. (Id.).

Plaintiff presented to the emergency room on May 1, 2008, with complaints of dizziness for two weeks. (Tr. 762, 765). Plaintiff was diagnosed with anemia and gastritis. (Tr. 763).

Plaintiff was hospitalized from June 14, 2008, through June 17, 2008, due to nausea and vomiting. (Tr. 791). Plaintiff underwent an abdominal CT scan, which revealed enlarged portacaval lymph nodes, probably related to plaintiff's HIV. (Id.). Plaintiff's symptoms were treated with medication. (Id.). It was also noted that plaintiff displayed some abnormal psychological behavior. (Id.). Plaintiff saw Dr. Ahmed Malki for a psychiatric consult, who diagnosed plaintiff with profound depression. (Id.). Upon discharge, plaintiff was diagnosed with depression, nausea and vomiting, HIV positive, complex pain management problem, and colonic ulcers. (Id.).

Plaintiff saw David M. Glick, M.D. on July 7, 2008, for various chronic problems including HIV, depression, and chronic episodic abdominal pain. (Tr. 917). Dr. Glick indicated that plaintiff could have months of being relatively symptom-free, then abruptly have pain so severe that he ends up in the emergency room. (Id.). Dr. Glick recommended that plaintiff see a pain management

specialist and a liver specialist.  (Id.).

Plaintiff was hospitalized from July 12, 2008, through July 17, 2008, with abdominal pain, nausea, and vomiting.  (Tr. 854).  Plaintiff underwent an extensive GI work-up, which produced no definitive explanation for his complaints.  (Id.).  During the course of plaintiff's hospitalization, plaintiff's symptoms resolved.  (Id.).  Upon discharge, plaintiff was prescribed Reglan.  (Id.).

Plaintiff followed-up with Dr. Glick on July 18, 2008, at which time Dr. Glick noted that plaintiff was somewhat weak appearing and his abdomen was mildly tender.  (Tr. 919).  Dr. Glick prescribed Oxycodone.  (Id.).  On July 24, 2008, plaintiff reported that his abdominal pain decreased with the Oxycodone.  (Tr. 920).  Dr. Glick agreed to treat plaintiff with opiate analgesics pending further information from specialists.  (Id.).  On July 28, 2008, Dr. Glick discontinued the Oxycodone due to complaints of headaches.  (Tr. 921).  Dr. Glick recommended that plaintiff take ibuprofen instead and present to the emergency room in the event of pancreatic pain.  (Id.).  Plaintiff called Dr. Glick's office on August 19, 2008, to report that he had been hospitalized due to experiencing six attacks of pancreatic pain.  (Tr. 922).  Plaintiff saw Dr. Glick on August 27, 2008, at which time Dr. Glick prescribed Hydromorphone.  (Tr. 923).

On September 17, 2008, a liver biopsy revealed chronic hepatitis and extensive periportal fibrosis.[43]  (Tr. 925).

Plaintiff saw Inna Park, M.D., for an internal medicine examination at the request of the state agency on December 3, 2008.  (Tr. 931-33).  Plaintiff reported a history of pancreatitis, with his first attack occurring five to six years ago.  (Tr. 931).  Plaintiff indicated that he had been to the emergency

_____

[43]Formation of fibrous tissue as a reparative or reactive process, as opposed to formation of fibrous tissue as a normal constituent of an organ or tissue.  Stedman's at 726.

room three times and had been hospitalized twice in November. (Id.). It was noted that plaintiff was HIV positive and that plaintiff's viral load had gone up in the past year due to his hospitalizations and his going on and off medications. (Tr. 931-32). Upon physical examination, Dr. Park noted very mild diffuse tenderness throughout plaintiff's abdomen. (Tr. 933). Dr. Park noted that plaintiff's affect was anxious. (Tr. 932). Dr. Park diagnosed plaintiff with chronic abdominal pain with a history of pancreatitis and possible overlying irritable bowel syndrome;[44] and HIV positive with no secondary complications as of yet. (Tr. 933). Dr. Park also completed a Medical Source Statement of Ability to do Work-Related Activities (Physical), in which she expressed the opinion that plaintiff could continuously lift and carry up to fifty pounds; sit for four hours without interruption and sit a total of eight hours in an eight-hour work day; stand four hours without interruption and stand a total of eight hours in an eight-hour workday; and walk for two hours without interruption and walk a total of six hours in an eight-hour work day. (Tr. 937-38).

## The ALJ's Determination

The ALJ made the following findings:

1.  The claimant met the special earnings requirements of the Act as of December 19, 2005, the alleged onset date of disability, and continues to meet them through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since December 19, 2005. He did some work for pay in 2006, but none that constituted substantial gainful activity in terms of duration of employment or amounts of average monthly earnings according to the earnings guidelines of 20 CFR 404.1574 and 416.974.

3.  The medical evidence establishes that the claimant has Human Immunodeficiency Virus infection, mildly active or inactive hepatitis B, hyperlipidemia controlled by

---

[44]A condition characterized by gastrointestinal signs and symptoms including constipation, diarrhea, gas, and bloating, all in the absence of organic pathology. Stedman's at 1902.

medication, and a history of recurrent major depressive disorder, but no impairment or combination of impairments that meets or equals in severity the requirements of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

4.     The claimant's allegation of impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity is not credible, for the reasons set out in the body of this decision.

5.     The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except probably for lifting or carrying more than 10 pounds frequently or more than 20 pounds occasionally; doing more than simple, repetitive tasks; or having more than occasional interaction with co-workers, supervisors or the general public. There are no other credible, medically-established mental or other nonexertional limitations (20 CFR 404.1545 and 416.945).

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant's residual functional capacity for the full range of at least light work is reduced by the mental limitations described in Finding No. 5.

8.     The claimant is 39 years old, defined as a younger individual (20 CFR 404.1563 and 416.963).

9.     The claimant is a high school graduate (20 CFR 404.1564 and 416.964).

10.    The claimant has acquired but not usable skills transferable to the skilled or semi-skilled functions of other work (20 CFR 404.1568 and 416.968).

11.    Based on an exertional functional capacity for at least light work, and the claimant's age, education, and work experience, 20 CFR 404.1569 and 416.969 and Rule 202.21, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

12.    Although the claimant's limitations do not allow the performance of the full range of at least light work, there is, using the above-cited Rule as a framework for decision-making, a significant number of jobs in the local and national economies which the claimant could perform. Examples of such jobs are electronics assembler. A total of about 4000 of these jobs exists in the St. Louis Standard Metropolitan Statistical Area, according to vocational expert opinion.

13.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

14.     The claimant has no substance use disorder that is uncontrollable and that prevents the performance of substantial gainful activity.

(Tr. 16-17).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based upon the applications filed on December 14, 2006, the claimant is not entitled to a period of disability or to disability insurance benefits under Sections 216(I) and 223, respectively, of the Social Security Act; and is not eligible for supplemental security income under Sections 1602     and 1614(a)(3)(A) of the Act.

(Tr. 17).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the

weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

## B. The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful

employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758. Application of the special procedures required is now documented

in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

C.    **Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional capacity.

Plaintiff next argues that the ALJ erred in evaluating plaintiff's mental limitations and in failing to order a consultative mental examination. Plaintiff also contends that the ALJ erred in assessing the credibility of plaintiff's subjective complaints. The undersigned will discuss plaintiff's claims in turn, beginning with the ALJ's credibility analysis.

## 1.    Credibility Analysis

Plaintiff argues that the ALJ erred in assessing the credibility of his subjective complaints of pain and limitation. Specifically, plaintiff contends that the ALJ failed to account for evidence of significant side effects from medications.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's prior work history; (2) the claimant's daily activities; (3) the duration, frequency, and intensity of the pain; (4) aggravating and precipitating factors; (5) dosage, effectiveness and side effects of the medication; and (6) functional restrictions. Polaski, 739 F.2d at 1322. See also Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005); 20 C.F.R. § 416.929.

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when []he claims that [the pain] hurts so much that it prevents h[im] from engaging in h[is] prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent him from working are credible.

In his opinion, the ALJ specifically cited the relevant Polaski factors. (Tr. 11). The ALJ then pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain.

The ALJ first properly pointed out that plaintiff had a very good work record in some of the years up to his alleged onset date of disability. (Tr. 11). Although plaintiff's good work record was a factor in favor of plaintiff's credibility, the ALJ found that other factors outweighed it when assessing his credibility. (Id.).

The ALJ next discussed the medical evidence and found that it did not support plaintiff's subjective complaints. (Tr. 13-15). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ noted that, although plaintiff is HIV positive, he has not developed AIDS. (Tr. 14). The ALJ stated that plaintiff recovered well from his cholecystectomy in April 2006. (Id.). The ALJ pointed out that plaintiff's blood pressure was well-controlled by medication. (Id.). The ALJ stated that, to the extent plaintiff's hepatitis B has ever been active, it has not resulted in any functional

limitations.  (Id.).

With regard to plaintiff's mental impairments, the ALJ stated that plaintiff has not received constant treatment at a mental health clinic.  (Id.).  This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability.  See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997).  The ALJ also noted that plaintiff displayed no obvious signs of a mental disturbance at the hearing.  (Tr. 15).

The ALJ next pointed out that no doctor who treated or examined plaintiff ever expressed the opinion that plaintiff was disabled or imposed any significant limitations.  (Tr. 14).  The presence or absence of functional limitations is an appropriate Polaski factor, and "[t]he lack of physical restrictions militates against a finding of total disability." Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)).  The ALJ noted that consultative physician Dr. Park expressed the opinion that plaintiff could lift up to fifty pounds.  (Tr. 14).

Plaintiff contends that the ALJ erred in failing to discuss the dosage, effectiveness, and side effects of medication.  The ALJ, however, stated as follows:

> There is no documented record of any significant, uncontrollable adverse side effects from medications that claimant takes or has taken.  Whatever adverse side effects the claimant may have had at various times were presumably in all instances eliminated or at least greatly diminished by simple changes in either the type of medication or the size and/or frequency of the dosages.

(Tr. 14).  The record supports the ALJ's finding that there is no documented record of any significant, uncontrollable adverse side effects from plaintiff's medications.  Although plaintiff consistently sought treatment for nausea and vomiting, the record does not establish that plaintiff's nausea and vomiting was caused by his medications.  Rather, plaintiff's symptoms have been attributed to many different possible causes, including gastritis, proctitis, pancreatitis, hiatal hernia, peptic ulcer disease, GERD,

and gallbladder disease. (Tr. 293, 344, 382, 537, 583).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

## 2. Residual Functional Capacity

Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity. Specifically, plaintiff contends that the ALJ failed to account for all of plaintiff's physical and mental limitations, and failed to properly develop the record regarding plaintiff's mental limitations. Plaintiff also argues that the ALJ erred in evaluating the medical opinion evidence.

The ALJ made the following determination regarding plaintiff's RFC:

The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except probably for lifting or carrying more than 10 pounds frequently or more than 20 pounds occasionally; doing more than simple, repetitive tasks; or having more than occasional interaction with co-workers, supervisors or the general public. There are no other credible, medically-established mental or other nonexertional limitations (20 CFR 404.1545 and 416.945).

(Tr. 16).

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id.

at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" Id. at 1023 (quoting Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001)). The ALJ is therefore required to consider at least some supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where

other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

Whatever weight the ALJ accords the treating physician's report, be it substantial or little, the ALJ is required to give good reasons for the particular weight given the report. See Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). The ALJ, however, is not required to discuss every piece of evidence submitted. See Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998). If the opinion of a treating physician is not well supported or is inconsistent with other evidence, the ALJ must consider: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by the relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered, and (6) other factors which may contradict or support the opinion. See Rhodes, 40 F. Supp.2d at 1119; 20 C.F.R. § 404.1527 (d)(2)-(6).

Plaintiff first argues that the ALJ erred in failing to sufficiently account for limitations arising out of plaintiff's debilitating abdominal pain, nausea, and vomiting. The ALJ found that plaintiff was capable of performing the physical exertional and noexexertional requirements of light work except for doing more than simple, repetitive tasks; or having more than occasional interaction with co-workers, supervisors or the general public. (Tr. 16). The ALJ noted that consulting physician Dr. Park expressed the opinion that plaintiff was capable of lifting and carrying fifty pounds. (Tr. 13). Although the ALJ did not indicate the weight he was assigning to Dr. Park's opinion, the ALJ appeared to rely, at least in part, on this opinion.

Dr. Park examined plaintiff on one occasion, on December 3, 2008, at the request of the state agency. (Tr. 931-33). Plaintiff reported a history of pancreatitis, with his first attack occurring five to six years ago. (Tr. 931). Plaintiff indicated that he had been to the emergency room three times and had been hospitalized twice in November due to abdominal symptoms. (Id.). Upon physical examination, Dr. Park noted very mild diffuse tenderness throughout plaintiff's abdomen. (Tr. 933). Dr. Park diagnosed plaintiff with chronic abdominal pain with a history of pancreatitis and possible overlying irritable bowel syndrome; and HIV positive with no secondary complications as of yet. (Tr. 933). Dr. Park also completed a Medical Source Statement of Ability to do Work-Related Activities (Physical), in which she expressed the opinion that plaintiff could continuously lift and carry up to fifty pounds; sit for four hours without interruption and sit a total of eight hours in an eight-hour work day; stand four hours without interruption and stand a total of eight hours in an eight-hour workday; and walk for two hours without interruption and walk a total of six hours in an eight-hour work day. (Tr. 937-38).

The record reveals that plaintiff was hospitalized for complaints of abdominal pain, nausea, or vomiting on at least six occasions from his alleged onset date to the date of the hearing. Plaintiff was hospitalized from March 19, 2006, through March 21, due to complaints of nausea, vomiting, and abdominal pain. (Tr. 382). It was noted that plaintiff complaints were caused either by gallbladder disease, a drug reaction to HIV medications, or an HIV-related dysautonomia. (Tr. 382-83). Plaintiff was hospitalized from April 22, 2006, through April 29, 2006, with complaints of worsening abdominal pain. (Tr. 236). Plaintiff with diagnosed with cholecystits. (Tr. 238). Plaintiff was hospitalized from July 11, 2007, through July 14, 2007, for lower left quadrant pain and bloody stools. (Tr. 745-49). Plaintiff underwent CT scans, which revealed colitis, gastritis, a small periumbilical

hernia, and hepatomegaly. (Tr. 750). On October 31, 2007, plaintiff was hospitalized overnight for intractable nausea and vomiting. (Tr. 770). Plaintiff was diagnosed with subacute to chronic nausea and vomiting of unknown origin. (Tr. 771). Plaintiff was hospitalized from June 14, 2008, through June 17, 2008, due to nausea and vomiting. (Tr. 791). Plaintiff was also hospitalized for abdominal pain, nausea, and vomiting from July 12, 2008, through July 17, 2008. (Tr. 854).

Plaintiff also received emergency room treatment for these symptoms on approximately five separate occasions during this same period. Plaintiff presented to the emergency room on May 21, 2006, with complaints of nausea and bloody stool. (Tr. 226). It was noted that pancreatitis could be the cause of plaintiff's symptoms. (Id.). On October 23, 2006, plaintiff received emergency room treatment for complaints of abdominal pain, nausea, and vomiting. (Tr. 537). A CT scan revealed a small hiatal hernia and hepatomegaly. (Tr. 578). Plaintiff returned to the emergency room on October 29, 2006, with complaints of chest pain, nausea, and vomiting. (Tr. 583). Plaintiff was diagnosed with gastritis and GERD. (Tr. 584). On April 19, 2007, plaintiff presented to the emergency room with complaints of lower right-side abdominal pain. (Tr. 614). Plaintiff was diagnosed with an inguinal hernia. (Tr. 616). On July 31, 2007, plaintiff received treatment for complaints of abdominal pain, back pain, and bloody stools. (Tr. 734). Plaintiff was diagnosed with gastritis. (Tr. 738).

The undersigned finds that the ALJ's physical RFC determination is not supported by substantial evidence. The ALJ did not provide a rationale for his RFC, although he appeared to rely on the opinion of one-time consulting physician Dr. Park, who found that plaintiff was capable of lifting up to fifty pounds. "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).

While it is likely that plaintiff was capable of lifting up to fifty pounds on the day that Dr. Park examined him, the ALJ failed to take into consideration the effect of plaintiff's debilitating episodes of gastrointestinal symptoms. As previously discussed, plaintiff was hospitalized on seven occasions for lengths varying from one to seven nights due to symptoms of abdominal pain, nausea, and vomiting. Plaintiff also received emergency room treatment on approximately five separate occasions during this period. Plaintiff has been prescribed multiple medications for his nausea and vomiting, and has been prescribed narcotic analgesics for pain. Although plaintiff's physicians have differing opinions as to the etiology of these symptoms, no physician has questioned whether plaintiff was truly experiencing these symptoms.

As the ALJ pointed out, none of plaintiff's treating physicians has expressed an opinion regarding plaintiff's ability to work with his impairments. "A treating doctor's silence on the claimant's work capacity does not constitute substantial evidence supporting [an] ALJ's functional capacity determination when the doctor was not asked to express an opinion on the matter and did not do so, particularly when that doctor did not discharge the claimant from treatment." Pate-Fires v. Astrue, 564 F.3d 935, 943 (8th Cir. 2009).

The ALJ erred in relying on the opinion of a one-time consulting physician in formulating a RFC that did not take into account all of plaintiff's limitations. Specifically, the ALJ's RFC did not account for the effect of plaintiff's debilitating episodes of gastrointestinal symptoms. These episodes would be expected to result in functional limitations and in frequent work absences. As such, the ALJ's physical RFC is not supported by substantial evidence.

Plaintiff also argues that the ALJ erred in determining plaintiff's mental RFC. As previously stated, the ALJ found that plaintiff was limited to simple, repetitive tasks; and no more than occasional

interaction with co-workers, supervisors, or the general public. (Tr. 16). The ALJ did not cite to any medical opinions in support of his determination.

The only opinion in the record regarding plaintiff's mental limitations is the opinion of a non-examining state agency psychologist, James Lane, Ph.D., who completed a Psychiatric Review Technique on February 27, 2007. (Tr. 602-613). Dr. Lane expressed the opinion that plaintiff's major depressive disorder with psychotic features and polysubstance abuse resulted in mild limitations in plaintiff's activities of daily living and ability to maintain social functioning; and moderate limitations in plaintiff's ability to maintain concentration, persistence, or pace. (Id.). Dr. Lane stated that plaintiff retains the functional capacity to interact adequately with peers and supervisors; understand, follow, and complete at least simple instructions; maintain adequate concentration, persistence and pace with at least simple work duties; and adapt adequately to routine work changes. (Tr. 601). The ALJ did not indicate the weight he was assigning to Dr. Lane's opinion.

The undersigned finds that the ALJ's mental RFC is not supported by substantial evidence. The record reveals that, since his alleged onset date, plaintiff has been diagnosed with bipolar disorder, recurrent major depressive disorder with psychotic features, and generalized anxiety disorder with panic attacks. (Tr. 388, 460, 670, 685). Plaintiff has been treated with psychiatric drugs, including Prozac, Zyprexa, Klonopin, and Trazodone. (Tr. 459). Plaintiff was hospitalized for depression from October 11, 2006, through October 18, 2006, with complaints of suicidal ideation. (Tr. 459-60). Plaintiff received regular psychiatric treatment at Community Alternatives from September 2007 through February 2008, due to complaints of depression and paranoia. (Tr. 669-707). On October 31, 2007, plaintiff reported feeling suicidal. (Tr. 686). It was noted that plaintiff had depressive symptoms, including poor energy and poor concentration in January 2008. (Tr. 707). Plaintiff was

admitted due to mental health issues from February 2, 2008, through February 7, 2008. (Tr. 714). During a June 2008 hospital stay, plaintiff saw a psychiatrist who diagnosed plaintiff with profound depression. (Tr. 791). Further, the record indicates that plaintiff was hospitalized due to suicidal ideation from April 13, 2004 to May 7, 2004, prior to his alleged onset of disability date, at which time plaintiff reported a history of three prior suicide attempts by overdose. (Tr. 468).

Despite plaintiff's extensive mental health history, there is no opinion in the record from an examining mental health provider, treating or consulting, regarding plaintiff's ability to perform work-related activities. As previously noted, the only opinion in the record is from non-examining state agency psychologist Dr. Lane. Significantly, Dr. Lane provided his opinion in February 2007, over eighteen months prior to the September 2008 hearing. As such, Dr. Lane did not have the benefit of subsequent records, including records from plaintiff's regular treatment at Community Alternatives, or plaintiff's subsequent diagnosis of profound depression. Thus, Dr. Lane's opinion based on an incomplete review of plaintiff's records does not constitute substantial evidence upon which the ALJ can support his decision.

The residual functional capacity must be based on some medical evidence; if there is no such evidence, the residual functional capacity "cannot be said to be supported by substantial evidence." Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995). An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace. See Hutsell, 259 F.3d at 711-712; Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). Here, the ALJ's mental residual functional capacity assessment fails Lauer's test that the residual functional capacity be supported by *some* medical evidence. See Lauer, 245 F.3d at 703.

## Conclusion

In sum, the ALJ erred in formulating a residual functional capacity that was not based on substantial evidence. For these reasons, this cause will be reversed and remanded to the ALJ in order for the ALJ to obtain medical evidence addressing plaintiff's ability to function in the workplace with his mental impairments; consider the effect of plaintiff's gastrointestinal symptoms on his physical ability to work; and formulate a new residual functional capacity for plaintiff based on the medical evidence in the record. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this  15th  day of March, 2012.

_Lewis M. Blanton_

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE